## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.

*Plaintiffs,*

v.

THE DOW CHEMICAL COMPANY

and

E.I. DU PONT DE NEMOURS
AND COMPANY,

*Defendants.*

Case No.:  1:17-cv-01176-APM

Judge: Amit Mehta

## FINAL JUDGMENT

WHEREAS, plaintiffs United States of America and the States of Iowa, Mississippi, and

Montana (collectively, "Plaintiff States"), filed their Complaint on June 15, 2017, plaintiffs and

defendants, The Dow Chemical Company and E.I. du Pont de Nemours and Company, by their

respective attorneys, have consented to the entry of this Final Judgment without trial or

adjudication of any issue of fact or law, and without this Final Judgment constituting any

evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain

divestiture of certain rights and assets by defendants to assure that competition is not

substantially lessened;

AND WHEREAS, plaintiffs require defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to plaintiffs that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to which defendants divest the Divestiture Assets.

B.    "Acquirer of the Crop Protection Divestiture Assets" means the entity to which defendants divest the Crop Protection Divestiture Assets.

C.    "Acquirer of the Material Science Divestiture Assets" means the entity to which defendants divest the Material Science Divestiture Assets.

D.    "DuPont" means defendant E.I. du Pont de Nemours and Company, a Delaware corporation with its headquarters in Wilmington, Delaware, its successors and assigns, and its

subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Dow Chemical" means defendant The Dow Chemical Company, a Delaware corporation with its headquarters in Midland, Michigan, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

F.      "Calgary Facility" means DuPont's interest in the facility located at 4444 72nd Avenue SE, Calgary, Alberta, Canada T2C 2C1.

G.      "Freeport Facility" means Dow Chemical's dedicated acid copolymer production facility located within the B-7700 Block and B-7800 Block of Dow Chemical's integrated chemical site at 2301 Brazosport Blvd., APB Building, Freeport, Texas 77541, including a ground lease to the real property underlying the Freeport Facility, but not including ownership of any underlying real property.

H.      "Manati Manufacturing Unit" means the manufacturing unit within DuPont's industrial complex at Km 2/3 Rr 686, Tierras Nuevas Salientes Ward, Manati, Puerto Rico 00674.

I.      "Mobile Facility" means DuPont's facility located at 12650 Highway 43 N, Axis, Alabama 36505.

J.      "DuPont's Finesse-formulated products" means all products (including Finesse) packaged at the Calgary Facility and containing the active ingredients Metsulfuron Methyl and Chlorsulfuron Methyl produced at the Manati Manufacturing Unit.

3

K.      "DuPont's Rynaxypyr-formulated products" means all products manufactured at the Mobile Facility that contain the active ingredient Chlorantraniliprole (including Altacor, Coragen, and Prevathon), except seed treatment applications.

L.      The "Finesse Business" means:

1.      the Manati Manufacturing Unit;

2.      the lease to the Calgary Facility;

3.      all tangible assets primarily relating to DuPont's Finesse-formulated products, including, but not limited to, manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets at the Manati Manufacturing Unit and at the Calgary Facility used in connection with DuPont's Finesse-formulated products; all licenses, permits and authorizations issued by any governmental organization primarily relating to DuPont's Finesse-formulated products (to the extent such licenses, permits, and authorizations are capable of assignment or transfer); all contracts (or portions thereof), teaming arrangements, agreements (or portions thereof), leases, commitments, certifications, and understandings, primarily relating to DuPont's Finesse-formulated products, including supply agreements; all customer lists, contracts, accounts, and credit records primarily relating to DuPont's Finesse-formulated products; all repair and performance records and all other records primarily relating to DuPont's Finesse-formulated products; except that defendants may retain copies of or access to any tangible assets primarily relating to DuPont's Finesse-formulated products that are necessary in order to perform any services pursuant to their agreements with the Acquirer of the Crop Protection Divestiture Assets, provided, however, that defendants may not otherwise use any such tangible assets in

4

connection with the development, manufacture, and/or sale of broadleaf herbicides for winter wheat; and

4.     all intangible assets owned, licensed, controlled, or used by DuPont, wherever located, primarily relating to DuPont's Finesse-formulated products, including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks (including Finesse), trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information DuPont provides to its own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts primarily relating to DuPont's Finesse-formulated products, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments; except that defendants may retain copies of or access to any intangible assets primarily relating to DuPont's Finesse-formulated products that are necessary in order to perform any services pursuant to their agreements with the Acquirer of the Crop Protection Divestiture Assets, provided, however, that defendants may not otherwise use any such intangible assets in connection with the development, manufacture, and/or sale of broadleaf herbicides for winter wheat.

M.     The "Rynaxypyr Business" means:

1.     the Mobile Facility;

2.     all tangible assets primarily relating to DuPont's Rynaxypyr-formulated products, including, but not limited to, manufacturing equipment, tooling and fixed assets,

5

personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets at the Mobile Facility used in connection with DuPont's Rynaxypyr-formulated products; all licenses, permits, and authorizations issued by any governmental organization primarily relating to DuPont's Rynaxypyr-formulated products (to the extent such licenses, permits, and authorizations are capable of assignment or transfer); all contracts (or portions thereof), teaming arrangements, agreements (or portions thereof), leases, commitments, certifications, and understandings, primarily relating to DuPont's Rynaxypyr-formulated products, including supply agreements; all customer lists, contracts, accounts, and credit records primarily relating to DuPont's Rynaxypyr-formulated products; all repair and performance records and all other records primarily relating to DuPont's Rynaxypyr-formulated products; except that defendants (i) may retain copies of or access to any tangible assets used by DuPont primarily relating to the Rynaxypyr-formulated products that are necessary in order to perform any services pursuant to their agreements with the Acquirer of the Crop Protection Divestiture Assets and (ii) may retain seed treatment assets, provided, however, that defendants may not otherwise use any such tangible assets in connection with the development, manufacture, and/or sale of insecticides for chewing pests; and

3.      all intangible assets owned, licensed, controlled, or used by DuPont, wherever located, primarily relating to DuPont's Rynaxypyr-formulated products, including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks (including Altacor, Coragen, and Prevathon), trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality

assurance and control procedures, design tools and simulation capability, all manuals and technical information DuPont provides to its own employees, customers, suppliers, agents or licensees; and all research data concerning historic and current research and development efforts primarily relating to DuPont's Rynaxypyr-formulated products, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments; except that defendants (i) may retain copies of or access to any intangible assets used by DuPont relating to DuPont's Rynaxypyr-formulated products that are necessary in order to perform any services pursuant to their agreements with the Acquirer of the Crop Protection Divestiture Assets and (ii) may retain seed treatment assets, provided, however, that defendants may not otherwise use any such intangible assets in connection with the development, manufacture, and/or sale of insecticides for chewing pests.

N.    "Crop Protection Divestiture Assets" means:

1.    the Finesse Business; and

2.    the Rynaxypyr Business.

O.    "Material Science Divestiture Assets" means:

1.    the Freeport Facility;

2.    all tangible assets located at the Freeport Facility and primarily used by Dow Chemical's acid copolymer and ionomers business in the United States, including, but not limited to, research and development assets, manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property, except that the Material Science Divestiture Assets do not include (i) information technology, equipment, and tools (*e.g.*, servers, network equipment, and enterprise workstations) connected to Dow Chemical's network or (ii) tangible assets that will be used by defendants to perform any

7

services pursuant to their agreements with the Acquirer of the Material Science Divestiture Assets, provided, however, that defendants may not use any such tangible assets to develop, manufacture, and/or sell acid copolymers and ionomers; all licenses, permits, and authorizations issued by any governmental organization primarily for the benefit of the acid copolymer and ionomers business in the United States (to the extent such licenses, permits, and authorizations are capable of assignment or transfer); all contracts, teaming arrangements, agreements, including supply agreements, leases, commitments, certifications, and understandings primarily relating to Dow Chemical's acid copolymer and ionomers business in the United States (collectively "Contracts"), in each case to the extent relating to the acid copolymer and ionomers business, provided that to the extent transfer of any Contract requires the consent of another party, Dow Chemical shall satisfy its obligation by using reasonable best efforts to obtain such consent; all customer lists, accounts, and credit records, in each case to the extent relating to the acid copolymer and ionomers business; all records primarily relating to the acid copolymer and ionomers business in the United States, including repair and performance records, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, manuals and technical information Dow Chemical provides to its own employees, customers, suppliers, agents or licensees of such acid copolymer and ionomers business, and research data concerning historic and current research and development efforts, including but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments, in each case to the extent relating to the acid copolymer and ionomers business, except that defendants may retain copies of or access to (i) any such records used by defendants' retained businesses other than Dow

8

Chemical's acid copolymer and ionomers business and (ii) any such records used in connection with an OSA or to perform any services pursuant to their agreements with the Acquirer of the Material Science Divestiture Assets, provided, however, that defendants may not use any such records to develop, manufacture, and/or sell acid copolymers and ionomers; and

3.      all intangible assets primarily used by Dow Chemical in connection with the development, manufacture, and/or sale of acid copolymers and ionomers in the United States, including, but not limited to, patents, licenses and sublicenses, intellectual property, copyrights, trademarks (including Primacor), trade names, service marks, service names, technical information, know-how, and trade secrets, except that, to the extent any intangible assets primarily used by Dow Chemical's acid copolymer and ionomers business in the United States are also used by other Dow Chemical businesses or are necessary to perform any services pursuant to defendants' agreements with the Acquirer of the Material Science Divestiture Assets, defendants will receive a license to use such intangible assets from the Acquirer of the Material Science Divestiture Assets, provided, however, that defendants may not use any such intangible assets to develop, manufacture, and/or sell acid copolymers and ionomers.

P.      "Divestiture Assets" means the Crop Protection Divestiture Assets and the Material Science Divestiture Assets.

## III.   **APPLICABILITY**

A.      This Final Judgment applies to DuPont and Dow Chemical, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV, V, and VI of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or lesser business

9

units that include the Divestiture Assets, they shall require the purchaser or purchasers to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Final Judgment.

## IV.   CROP PROTECTION DIVESTITURE

A.      Defendants are ordered and directed, within thirty (30) calendar days after the consummation of the merger of Dow Chemical and DuPont, or sixty (60) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Crop Protection Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion, after consultation with the Plaintiff States. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Crop Protection Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestiture ordered by Section IV of this Final Judgment, to the extent they have not done so prior to the filing of the Complaint, defendants promptly shall make known, by usual and customary means, the availability of the Crop Protection Divestiture Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Crop Protection Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers of the Crop Protection Divestiture Assets, subject to customary confidentiality assurances, all information and documents relating to the Crop Protection Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.

Defendants shall make available such information to plaintiffs at the same time that such information is made available to any other person.

     C.     To the extent they have not done so prior to the filing of the Complaint, defendants shall provide to the prospective Acquirer of the Crop Protection Divestiture Assets and the United States information relating to the personnel involved in the development, manufacture, and/or sale of the Crop Protection Divestiture Assets to enable the Acquirer to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer of the Crop Protection Divestiture Assets to employ any defendant employee whose primary responsibility is the development, manufacture, and/or sale of the Crop Protection Divestiture Assets.

     D.     Defendants shall permit the Acquirer of the Crop Protection Divestiture Assets to have reasonable access to personnel and to make inspections of the Manati Manufacturing Unit, the Calgary Facility, and the Mobile Facility; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

     E.     Defendants shall warrant to the Acquirer of the Crop Protection Divestiture Assets that each asset will be operational in all material respects on the date of sale.

     F.     Defendants shall not take any action that will impede in any material way the permitting, operation, or divestiture of the Crop Protection Divestiture Assets.

     G.     At the option of the Acquirer of the Crop Protection Divestiture Assets, defendants shall enter into a contract for formulation services for the Finesse-formulated products at DuPont's El Paso, Illinois facility and the Rynaxypyr-formulated products at DuPont's Valdosta, Georgia facility. The formulation services agreement shall be in effect for

one year after all necessary regulatory approvals for a new formulation site have been granted by jurisdictions where the Finesse-formulated products and the Rynaxypyr-formulated products are currently registered (or such lesser period of time as mutually expected by the defendants and the Acquirer of the Crop Protection Divestiture Assets). At the request of the Acquirer, the United States in its sole discretion may approve an extension of the term of the formulation services agreement not to exceed two (2) years, provided that the Acquirer of the Crop Protection Divestiture Assets notifies the United States in writing at least four (4) months prior to the date the agreement expires. The United States shall respond to any such request for extension in writing at least three (3) months prior to the date the formulation services agreement expires. The terms and conditions of any contractual arrangement meant to satisfy this provision must be reasonably related to market conditions for formulation services.

H.      Defendants shall warrant to the Acquirer of the Crop Protection Divestiture Assets that there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset, and that following the sale of the Crop Protection Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Crop Protection Divestiture Assets.

I.      Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by Divestiture Trustee appointed pursuant to Section VI, of this Final Judgment, shall include the entire Crop Protection Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, after consultation with the Plaintiff States, that the Crop Protection Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing business in the development, manufacture, and sale in the United States of

(1) broadleaf herbicides for winter wheat and (2) insecticides for chewing pests. The divestiture, whether pursuant to Section IV or Section VI of this Final Judgment,

(1)     shall be made to an Acquirer that, in the United States' sole judgment, after consultation with the Plaintiff States, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the businesses of developing, manufacturing, and selling (a) broadleaf herbicides for winter wheat and (b) insecticides for chewing pests; and

(2)     shall be accomplished so as to satisfy the United States, in its sole discretion, after consultation with the Plaintiff States, that none of the terms of any agreement between the Acquirer and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V.     MATERIAL SCIENCE DIVESTITURE

A.     Defendants are ordered and directed, within thirty (30) calendar days after the consummation of the merger of Dow Chemical and DuPont, or sixty (60) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Material Science Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Material Science Divestiture Assets as expeditiously as possible.

B.     In accomplishing the divestiture ordered by Section V of this Final Judgment, to the extent they have not done so prior to the filing of the Complaint, defendants promptly shall make known, by usual and customary means, the availability of the Material Science Divestiture Assets.  Defendants shall inform any person making an inquiry regarding a possible purchase of the Material Science Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers of the Material Science Divestiture Assets, subject to customary confidentiality assurances, all information and documents relating to the Material Science Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to plaintiffs at the same time that such information is made available to any other person.

C.     To the extent they have not done so prior to the filing of the Complaint, defendants shall provide the Acquirer of the Material Science Divestiture Assets and the United States information relating to personnel whose primary responsibility is the development, manufacture, and/or sale of the Material Science Divestiture Assets, excluding Dow Chemical employees who will provide services under the OSA, to enable the Acquirer to make offers of employment.  Defendants will not interfere with any negotiations by the Acquirer of the Material Science Divestiture Assets to employ any defendant employee whose primary responsibility is the development, manufacture, and/or sale of the Material Science Divestiture Assets, excluding Dow Chemical employees who will provide services under the OSA.

14

D.      Defendants shall permit the Acquirer of the Material Science Divestiture Assets to have reasonable access to personnel and to make inspections of the Freeport Facility; access to any and all environmental, zoning, and other permit documents and information related to the Freeport Facility; and access to any and all financial, operational, or other documents and information related to the Freeport Facility; in each case as customarily provided as part of a due diligence process.

E.      Defendants shall warrant to the Acquirer of the Material Science Divestiture Assets that such assets will be in substantially the same operating condition on the date of sale as they were on February 1, 2017.

F.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Material Science Divestiture Assets.

G.      At the option of the Acquirer of the Material Science Divestiture Assets, defendants shall enter into an operating services agreement ("OSA") with the Acquirer sufficient to meet the Acquirer's needs for assistance in matters relating to the operation of the Material Science Divestiture Assets.  If the Acquirer elects to self-operate the Material Science Divestiture Assets, defendants may require the written execution of an agreement by the Acquirer to indemnify defendants for breaches of any environmental permits that result from the operation of the Material Science Divestiture Assets by an operator other than defendants.

H.      Defendants shall warrant to the Acquirer of the Material Science Divestiture Assets that there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset, and that following the sale of the Material Science Divestiture

15

Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Material Science Divestiture Assets.

I.       Unless the United States otherwise consents in writing, the divestiture pursuant to Section V, or by Divestiture Trustee(s) appointed pursuant to Section VI, of this Final Judgment, shall include the entire Material Science Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Material Science Divestiture Assets can and will be used by the Acquirer of the Material Science Divestiture Assets as part of a viable, ongoing business in the development, manufacture, and sale of acid copolymers and ionomers in the United States.  The divestiture, whether pursuant to Section V or Section VI of this Final Judgment,

> (1)      shall be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of developing, manufacturing, and selling acid copolymers and ionomers; and
>
> (2)      shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between the Acquirer and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

16

## VI.    APPOINTMENT OF DIVESTITURE TRUSTEE(S)

A.    If defendants have not divested the Crop Protection or Material Science Divestiture Assets within the time periods specified in Paragraphs IV(A) and V(A), defendants shall notify plaintiffs of that fact in writing. Upon application of the United States, the Court shall appoint a Divestiture Trustee or Trustees selected by the United States and approved by the Court to effect the divestiture of the remaining Divestiture Asset(s).

B.    After the appointment of Divestiture Trustee(s) becomes effective, only the Divestiture Trustee(s) shall have the right to sell the relevant Divestiture Assets. The Divestiture Trustee(s) shall have the power and authority to accomplish the divestitures to Acquirer(s) acceptable to the United States, after consultation with the Plaintiff States, at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee(s), subject to the provisions of Sections IV, V, VI, and VII of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Paragraph VI(D) of this Final Judgment, the Divestiture Trustee(s) may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the Divestiture Trustee(s), and are reasonably necessary in the Divestiture Trustee(s)' judgment to assist in the divestiture(s). Any such investment bankers, attorneys, or other agents shall serve on such terms and conditions as the United States approves including confidentiality requirements and conflict of interest certifications.

C.    Defendants shall not object to a sale by the Divestiture Trustee(s) on any ground other than the Divestiture Trustee(s)' malfeasance. Any such objections by defendants must be conveyed in writing to United States and the Divestiture Trustee(s) within ten (10) calendar days after the Divestiture Trustee(s) have provided the notice required under Section VII.

17

D.     The Divestiture Trustee(s) shall serve at the cost and expense of defendants pursuant to a written agreement, on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications. The Divestiture Trustee(s) shall account for all monies derived from the sale of the assets sold by the Divestiture Trustee(s) and all costs and expenses so incurred. After approval by the Court of the Divestiture Trustee(s)' accounting, including fees for their services yet unpaid and those of any professionals and agents retained by the Divestiture Trustee(s), all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the Divestiture Trustee(s) and any professionals and agents retained by the Divestiture Trustee(s) shall be reasonable in light of the value of the relevant Divestiture Asset(s) and based on a fee arrangement providing the Divestiture Trustee(s) with an incentive based on the price and terms of the divestitures and the speed with which they are accomplished, but timeliness is paramount. If the Divestiture Trustee(s) and defendants are unable to reach agreement on the Divestiture Trustee(s)' or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of appointment of the Divestiture Trustee(s), the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The Divestiture Trustee(s) shall, within three (3) business days of hiring any other professionals or agents, provide written notice of such hiring and the rate of compensation to defendants and the United States.

E.     Defendants shall use their best efforts to assist the Divestiture Trustee(s) in accomplishing the required divestiture(s). The Divestiture Trustee(s) and any consultants, accountants, attorneys, and other agents retained by the Divestiture Trustee(s) shall have full and complete access to the personnel, books, records, and facilities of the Divestiture Asset(s), and

defendants shall develop financial and other information relevant to the Divestiture Asset(s) as the Divestiture Trustee(s) may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges.  Defendants shall take no action to interfere with or to impede the Divestiture Trustee(s)' accomplishment of the divestiture(s).

F.      After their appointment, the Divestiture Trustee(s) shall file monthly reports with the United States and, as appropriate, the Court setting forth the Divestiture Trustee(s)' efforts to accomplish the divestitures ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee(s) deem confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Asset(s), and shall describe in detail each contact with any such person.  The Divestiture Trustee(s) shall maintain full records of all efforts made to divest the Divestiture Asset(s).

G.      If the Divestiture Trustee(s) have not accomplished the divestitures ordered under this Final Judgment within six months after their appointment, the Divestiture Trustee(s) shall promptly file with the Court a report setting forth (1) the Divestiture Trustee(s)' efforts to accomplish the required divestiture(s), (2) the reasons, in the Divestiture Trustee(s)' judgment, why the required divestiture(s) have not been accomplished, and (3) the Divestiture Trustee(s)' recommendations.  To the extent such report contains information that the Divestiture Trustee(s) deem confidential, such report shall not be filed in the public docket of the Court.  The Divestiture Trustee(s) shall at the same time furnish such report to the United States which shall

have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee(s)' appointment by a period requested by the United States.

H.      If the United States determines that the Divestiture Trustee(s) have ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint substitute Divestiture Trustee(s).

## VII.   NOTICE OF PROPOSED DIVESTITURES

A.      Within two (2) business days following execution of any definitive divestiture agreement, defendants or the Divestiture Trustee(s), whichever is then responsible for effecting the divestitures required herein, shall notify plaintiffs of any proposed divestiture required by Section IV, V, or VI of this Final Judgment. If the Divestiture Trustee(s) are responsible, they shall similarly notify defendants. The notice shall set forth the details of the proposed divestitures and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Asset(s), together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by plaintiffs of such notice, the United States, after consultation with the Plaintiff States, may request from defendants, the proposed Acquirer, any other third party, or the Divestiture Trustee(s), if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the Divestiture Trustee(s) shall furnish any additional information requested, except such information or documents subject to the attorney-client privilege or work-product

doctrine, within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer, any third party, and the Divestiture Trustee(s), whichever is later, the United States shall provide written notice to defendants and the Divestiture Trustee(s), if there is one or more, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, a divestiture may be consummated, subject only to defendants' limited right to object to the sale under Paragraph VI(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, divestiture proposed under Section IV, V, or VI shall not be consummated. Upon objection by defendants under Paragraph VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII.   FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV, V or VI of this Final Judgment.

## IX.   ASSET PRESERVATION

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Asset Preservation Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## X.    AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV, V, and/or VI, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV, V, and/or VI of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

22

C.     Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## XI.    APPOINTMENT OF MONITORING TRUSTEE(S)

A.     Upon application of the United States, the Court shall appoint a Monitoring Trustee or Trustees selected by the United States and approved by the Court.

B.     The Monitoring Trustee(s) shall have the power and authority to monitor defendants' compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order entered by this Court, and shall have such other powers as this Court deems appropriate.  The Monitoring Trustee(s) shall be required to investigate and report on the defendants' compliance with this Final Judgment and the Asset Preservation Stipulation and Order and the defendants' progress toward effectuating the purposes of this Final Judgment.

C.     Subject to Paragraph XI(E) of this Final Judgment, the Monitoring Trustee(s) may hire at the cost and expense of defendants any consultants, accountants, attorneys, or other agents, who shall be solely accountable to the Monitoring Trustee(s), as reasonably necessary in the Monitoring Trustee(s)' judgment.  Any such consultants, accountants, attorneys, or other agents shall serve on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications.

D.     Defendants shall not object to actions taken by the Monitoring Trustee(s) in fulfillment of the Monitoring Trustee(s)' responsibilities under any Order of this Court on any ground other than the Monitoring Trustee(s)' malfeasance.  Any such objections by defendants must be conveyed in writing to the United States and the Monitoring Trustee(s) within ten (10) calendar days after the action taken by the Monitoring Trustee(s) giving rise to the defendants' objection.

23

E.      The Monitoring Trustee(s) shall serve at the cost and expense of defendants

pursuant to a written agreement with defendants and on such terms and conditions as the United

States approves, including confidentiality requirements and conflict of interest certifications.

The compensation of the Monitoring Trustee(s) and any consultants, accountants, attorneys, and

other agents retained by the Monitoring Trustee(s) shall be on reasonable and customary terms

commensurate with the individuals' experience and responsibilities.  If the Monitoring Trustee(s)

and defendants are unable to reach agreement on the Monitoring Trustee(s)' or any agents' or

consultants' compensation or other terms and conditions of engagement within fourteen (14)

calendar days of appointment of the Monitoring Trustee(s), the United States may, in its sole

discretion, take appropriate action, including making a recommendation to the Court.  The

Monitoring Trustee(s) shall, within three (3) business days of hiring any consultants,

accountants, attorneys, or other agents, provide written notice of such hiring and the rate of

compensation to defendants and the United States.

F.      The Monitoring Trustee(s) shall have no responsibility or obligation for the

operation of defendants' businesses.

G.      Defendants shall use their best efforts to assist the Monitoring Trustee(s) in

monitoring defendants' compliance with their individual obligations under this Final Judgment

and under the Asset Preservation Stipulation and Order.  The Monitoring Trustee(s) and any

consultants, accountants, attorneys, and other agents retained by the Monitoring Trustee(s) shall

have full and complete access to the personnel, books, records, and facilities relating to

compliance with this Final Judgment, subject to reasonable protection for trade secret or other

confidential research, development, or commercial information or any applicable privileges.

Defendants shall take no action to interfere with or to impede the Monitoring Trustee(s)'
accomplishment of their responsibilities.

H.      After their appointment, the Monitoring Trustee(s) shall file reports monthly, or
more frequently as needed, with the United States and, as appropriate, the Court setting forth
defendants' efforts to comply with their obligations under this Final Judgment and under the
Asset Preservation Stipulation and Order.  To the extent such reports contain information that the
Monitoring Trustee(s) deem confidential, such reports shall not be filed in the public docket of
the Court.

I.      The Monitoring Trustee(s) shall serve for at least six (6) months after the
divestiture of the Divestiture Assets is finalized pursuant to either Section IV, V and/or VI of this
Final Judgment.  The United States, in its sole discretion, may extend this time period.

J.      If the United States determines that the Monitoring Trustee(s) have ceased to act
or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court
appoint substitute Monitoring Trustee(s).

## XII.   COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment,
or of any related orders such as any Asset Preservation Stipulation and Order, or of determining
whether the Final Judgment should be modified or vacated, and subject to any legally recognized
privilege, from time to time authorized representatives of the United States Department of
Justice, including consultants and other persons retained by the United States, shall, upon written
request of an authorized representative of the Assistant Attorney General in charge of the
Antitrust Division, and on reasonable notice to defendants, be permitted:

       (1)     access during defendants' office hours to inspect and copy, or at the option

of the United States, to require defendants to provide hard copy or

electronic copies of, all books, ledgers, accounts, records, data, and

documents in the possession, custody, or control of defendants, relating to

any matters contained in this Final Judgment; and

       (2)     to interview, either informally or on the record, defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters. The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

defendants.

     B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

     C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, or of the Plaintiff States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

     D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XIII.   NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XIV.   RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.   EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XVI.   PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _____10|15|17_____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

_____
United States District Judge